UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>Harold W. Caton</u>

    v.                            Civil No. 04-cv-439-JD
                                      Opinion No. 2005 DNH 155
<u>Gale Norton, in her</u>
<u>official capacity as</u>
<u>Secretary of the Interior</u>


<u>O R D E R</u>

For the second time since this litigation began, the Secretary of the Interior has moved to dismiss Harold W. Caton's pro se complaint seeking relief under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), on the ground that Caton has already received all of the information he requested and that his case is therefore moot.  Caton objects.


<u>Background</u>

The court denied the Secretary's first motion to dismiss because Caton had sufficiently raised a question as to the good faith of the declaration purportedly demonstrating the adequacy of the response to his FOIA request.  2005 DNH 76, 2005 WL 1009544, at *4-*5 (D.N.H. May 2, 2005).  In the declaration, Lee Hammond, chief of administration for Lowell National Historical Park (the "LNHP"), sought to explain an apparent irregularity in her production of documents to Caton on January 20, 2005,

following his commencement of this action.

The LNHP had initially withheld some seventy-five documents identified as responsive to Caton's FOIA request on the basis of the deliberative process privilege.  Following Caton's appeal of that decision to the Department's FOIA officer, however, the Department decided to release thirty of those documents to Caton in their entirety, release forty-three in redacted form, and to continue withholding the remaining two in their entirety.  The Department's decisions on which documents to release in response to Caton's appeal, and in what form, were set forth in a memorandum drafted by a Department lawyer, Timothy E. Murphy, and provided to Hammond on October 22, 2004.  Attached to the memorandum was a set of the seventy-five documents originally withheld from Caton.  The documents were sequentially numbered, each with a handwritten, circled numeral in its upper right-hand corner.  In addition, the text of each document to be released in redacted form had brackets and highlighting to indicate which passages to redact.

Hammond used this set of documents to assemble the production to be made to Caton.  Instead of making a copy of the set for use in preparing the redacted documents, however, Hammond simply covered the appropriate text with black magic marker or correction fluid.  She then made a copy of the redacted documents

she had thus created and forwarded them to Caton under cover of a letter dated November 5, 2004.

Caton commenced this action on November 23, 2004, seeking, inter alia, unredacted versions of the documents produced on November 4 as well as the documents the Department continued to withhold.  The Department initially responded by offering to produce all of these documents in full except for a printout of a series of e-mails among employees of the LNHP dated October 2, 2001, and produced in redacted form on November 4 as document number 60.  After Caton refused this offer, the Department relented, agreeing to produce unredacted versions of all of the documents.  Hammond learned of this decision through Robin Friedman, another attorney for the Department, who instructed Hammond "to prepare immediately an un-redacted set of the 43 documents" produced to Caton in redacted form and to release them to him together with the two other documents which had been withheld in their entirety.  Hammond Decl. Supp. Mot. Correct Rec. ("Second Hammond Decl.") ¶ 12.  Friedman also said "that it was urgent to act promptly in getting these documents out to Mr. Caton."  Id.

Preparing an unredacted set of documents proved difficult, however, because Hammond had put permanent redacting marks on the numbered copies of the documents attached to Murphy's memorandum.

3

Although, as Hammond recalls, she felt "considerable stress" as a result of this predicament, Second Hammond Decl. ¶ 13, she managed to cobble together a set of clean documents from multiple sources, including a set of documents she had reviewed over the summer in response to Caton's FOIA request and, in some cases, the LNHP's own files.  None of the documents obtained from these sources was numbered, though, so Hammond had to number them to correspond to the set attached to Murphy's memorandum.  She produced the documents to Caton in a January 20, 2005, letter.

The January 20 production, however, omitted any version of the e-mail exchange which had been released in redacted form as document 6 in the November 5 production.  Although the January 20 production included a document bearing the number 6, it was different from the version of document no. 6 which had been produced earlier.  It was also the same as a document, bearing the number 60, which was included in the January 20 production.

Caton brought this irregularity to the attention of the Secretary's counsel in this case, Assistant United States Attorney T. David Plourde, through a January 21, 2005, e-mail. Plourde responded by sending a fax to Friedman noting that the redacted version of document 6 produced earlier represented e-mails dated September 4 and 5, 2001, while the more recent version of document 6 represented e-mails dated October 1, 2001.

4

Plourde also observed that "[i]t certainly is curious that all of the documents were painstakingly numbered and itemized in [Murphy's] internal memorandum asserting the privileges but that now, two different documents appear to have the same number." Mem. Obj. Mot. Compel & Supp. Mot. Prot. Order Ex. 8, Tab 2, at 2.  On January 24, 2005, Plourde forwarded Caton's e-mail to Hammond and asked her to "figure out what had happened" to cause the irregularity in the January 20 production.  Second Hammond Decl. ¶ 14.

Hammond, however, appears to have made little if any effort toward that end.  In her words, she "did not take the time to sit down with the file documents to try to re-create as nearly as possible exactly how the numbering error had been made."  Second Hammond Decl. ¶ 15.  Instead, she simply retrieved another clean copy of the printout of the September 4 and 5 e-mails and mailed it to Caton under cover of a letter dated January 25, 2005, which purported to explain the irregularity in the January 20 production.  As Hammond acknowledges, the letter "simply stated [her] quick assumption that the numbering error had occurred because the photocopier had cut off the 'zero' on document 60, leaving only the '6.'"  Id.; see also Ex. 11.

Hammond's account of how she went about assembling the documents to release to Caton on January 20, however, belies this

5

explanation.  Again, Hammond had created the redacted version of
the October 1 e-mail exchange released to Caton on November 5 by
using a black marker to cover the designated portions of the copy
of document 60 attached to Murphy's memorandum.  Second Hammond
Decl. ¶ 13; see also Compl. ¶ 46, Ex. J, Tab 60.  This forced her
to retrieve an unredacted version of that document from another
source in preparing the January 20 production, which meant that
she had to write the number 60 in the upper right-hand corner
herself before turning the document over to Caton.  Thus, the
numbered version of document 60 which had been attached to
Murphy's memorandum was not copied during the assembly of the
January 20 production.

Hammond claims that this did not occur to her at the time
she gave Caton her explanation of why document 6 from the
November 5 production was missing from the January 20 production.
The fact remains, however, that even a cursory glance at the
record released as document 6 in the January 20 production belies
Hammond's explanation.  Because the number appearing in the upper
right-hand corner of each record was circled, part of the circle
around the "60" on the record marked with that number would also
have been missing had the copier in fact cut off the "0" in the
way Hammond claimed.  The circle surrounding the number 6 on the
document released on January 20, however, is visible in its

entirety.   <u>See</u> Mem. Opp. Mot. to Dismiss, Ex. Z, Tab 6.

According to Hammond, this fact also escaped her notice when she sent the letter to Caton purportedly explaining the absence of document 6 from the January 20 production.  The Secretary attributes this "erroneous explanation" to "the exceedingly short time constraints under which Ms. Hammond was operating in making the disclosures."  Mem. Supp. Second Mot. Dismiss at 8.  But ten days after Hammond sent the letter, on February 3, 2005, she signed a declaration attesting that document 6 from the January 20 production "was a duplicate of a document that was numbered 60 by hand . . . but erroneously displayed only the number 6 as the 0 was missed by the copy machine."  First Hammond Decl. ¶ 5.  The declaration was drafted by Plourde, who at that time had seen both the version of document 6 released on January 20 and Hammond's letter of January 25.  Nevertheless, he also failed to recognize that Hammond's explanation could not be correct.

Based on Hammond's declaration, Plourde filed a motion to dismiss the case on February 4, 2005, arguing that Caton's receipt of the unredacted version of document 6 completed the Department's response to his FOIA request and mooted his claim.  Although purportedly submitted pursuant to 28 U.S.C. § 1746, the declaration was not subscribed to as true under penalty of perjury as that statute requires.  Plourde has since explained

7

that "[t]his error was a result of cutting and pasting text, and in the process failing to include the proper language."  Plourde Decl. Supp. Mot. Correct Rec. ("First Plourde Decl.") ¶ 15.

Caton objected to the motion to dismiss and moved to strike Hammond's declaration, arguing, inter alia, that her explanation was belied by the version of document 6 included in the January 20 production.  Mem. Opp'n Mot. Dismiss, Supp. Mot. Amend, Supp. Mot. Strike ("Mem. Opp'n Mot. Dismiss") ¶¶ 50–55 ; see also Mem. Supp. Mot. Strike §§ D.10–13.  Specifically, Caton noted that the copy machine could not have missed the "0" on document number 60 because the circle drawn around the number "6" remained intact. Both Caton's brief in opposition to the motion to dismiss and his brief in support of his motion to strike quoted Carney v. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994), for the proposition that "to justify discovery once the agency has satisfied its burden [of showing the adequacy of its FOIA response], the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations . . . ."  Mem. Opp'n Mot. Dismiss ¶ 57; Mem. Supp. Mot. Strike at 1.  Caton argued that he had made this showing by pointing out the obvious misstatement in Hammond's declaration.

On March 1, 2005, Plourde filed a reply to Caton's objection to the motion to dismiss, recognizing that "charitably construed,

Plaintiff contends that Ms. Hammond fails to adequately explain
how both [documents] came to be numbered '6' . . . ." Resp. Obj.
Mot. Dismiss at 3 n.2.  Nevertheless, Plourde argued that Caton
had "undeniably received unredacted copies of both sets of the
emails . . . .  Disclosure of the requested documents complete,
there is no basis for allegations of deceit, bad faith, and
unfounded malignment of individuals' personal and professional
integrity, much less for further discovery or sanctions."  Id.
The reply did not otherwise address Caton's assertion that the
inadequacy of Hammond's explanation meant that the case could not
be dismissed based on her declaration.

     On March 2, 2005, spurred by "Caton's observation that the
circle around the page number '6' in the January 20, 2005,
disclosure was not cut off by the copier," First Plourde Decl.
¶ 11, Plourde met with Hammond.  After retracing her steps in
making the January 20 disclosure, Hammond realized that she had
mistaken the set of e-mails previously identified as document 60
for the set previously identified as document 6 while searching
for a "clean" copy of document 6 to release to Caton in
unredacted form.  She also recognized that this mistake, rather
than an error by the copy machine, had caused her to send Caton a
second copy of document 60 in lieu of document 6 on January 20.

     After coming to this realization, however, neither Plourde

nor Hammond took any steps to inform either Caton or the court that her declaration submitted in support of the motion to dismiss contained a false statement.  Indeed, Plourde even passed up the opportunity to do so in the objection he filed to Caton's motion to strike the Hammond declaration on March 8, 2005, six days after Plourde's meeting with Hammond.  The objection simply noted that Caton's "allegations regarding the apparent mis-numbering and substitution of Document #60 are immaterial in light of his admitted receipt of complete, unredacted copies of both Documents 6 and 60."  Obj. Mot. Strike at 3–4 n.1.

In fact, Hammond and Plourde did not acknowledge that her declaration contained a false statement until May 18, 2005, sixteen days after the court issued its order denying the motion to dismiss and denying, as moot, the motion to strike.  The court noted in its order, as Caton had in his briefing on both motions, that "affidavits purporting to establish the adequacy of an agency's FOIA response must be 'relatively detailed and nonconclusory . . . and . . . submitted by responsible agency officials in good faith.'"  2005 DNH 76, 2005 WL 1009544, at *4 (quoting Maynard v. CIA, 986 F.2d 547, 559 (1st Cir. 1993)).  The court ruled that, although such affidavits enjoy a presumption of good faith, Caton had overcome it by showing that Hammond's explanation as to the substitution of document 60 for document 6

in the January 20 production appeared to be untrue.  Id.  The
court also voiced its own "concern" over that "apparently
counterfactual statement" coupled with the fact that Hammond had
not subscribed to her declaration as true under the penalties of
perjury as required by 28 U.S.C. § 1746.  Id. at *5.

The court also addressed the Secretary's argument, contained
in the footnote of its reply brief, that Caton's preliminary
showing of bad faith did not diminish the fact that he had
received an unredacted copy of document 6 on January 25.  Id.
The court reasoned that:

> Although the Secretary is correct that Hammond's
> dubious explanation of the document number 6 issue does
> not necessarily mean that the Department has not made a
> complete response to Caton's FOIA request, it
> nevertheless goes to the heart of how that request was
> processed and therefore constitutes the sort of bad
> faith which prevents the court from relying on the
> Hammond declaration in dismissing the case.

Id.  Accordingly, the court denied the motion to dismiss and
authorized Caton to "seek discovery concerning only the
circumstances of the creation of the version of document no. 6
contained in the January 20, 2005, production."  Id.

Plourde claims that the order on the motion to dismiss
opened his eyes to "the significance of the implausibility of Ms.
Hammond's 'photocopier' explanation to the underlying reliability
of the declaration . . . ."  First Plourde Decl. ¶ 16.  Until

then, Plourde says, he "had seen no logical or legal connection between [the] explanation . . . and the sole legal issue as to whether ultimate full disclosure had been made, particularly when Plaintiff's own submissions to the court established that fact." Id.  After Plourde's meeting with Hammond, in fact, he had "considered whether his ethical obligation of candor to the court required that [he] correct the record," but decided against it because "how the January 20, 2005, Document 6 came to be numbered '6' was logically and legally immaterial . . . ." Id. ¶¶ 12–13.

The court's order, however, followed by a meeting with the chief of the Civil Division of the United States Attorney's Office for this district, convinced Plourde that "prompt correction of the record by filing a supplemental declaration by Ms. Hammond explaining the true explanation for the document 6 issue possibly might have changed the court's mind regarding Ms. Hammond's good faith in the processing of Mr. Caton's FOIA claim."  First Plourde Decl. ¶ 16.  On May 16, 2005, Plourde filed a "motion to correct the record," together with a supplemental declaration from Hammond recounting her mistakes and his own declaration "explain[ing] the rationale underlying [his] considered decision not to amend Ms. Hammond's declaration." Id. ¶ 17.  Nevertheless, "given [Plourde's] perception that the Document 6 numbering explanation was immaterial to the fact of

full disclosure, [he] did not perceive, and does not now believe, that failure to correct the record on that point would constitute a material misrepresentation to the court." Id. Plourde allows, however, that "it appears possible that [his] decision on this point might be construed as a violation of [his] duty of candor to the court." Id.

The Secretary's motion to correct the record did not seek reconsideration of the order denying the motion to dismiss or authorizing Caton to take limited discovery or, for that matter, any relief other than allowing its supporting declarations to be filed.[1] Caton therefore proceeded to propound document requests, interrogatories, and requests for admission to the Secretary, demanding that nineteen different individuals provide sworn responses to the interrogatories.[2] Although the Secretary objected to that request, she nevertheless provided sworn interrogatory answers from five different Department employees,

---

[1]Caton filed an "objection" to the motion, noting that he did not object to the entry of the declarations but that he did object to their "correctness and completeness." Obj. Mot. Correct Record at 1. The motion was referred to the magistrate, who denied it as moot, presumably because the declarations had already been filed with the motion itself. Neither party has objected to the magistrate's ruling.

[2]Caton also asked for the depositions of five Department employees. Plourde provided Caton with a number of different dates to depose each of them, but Caton never responded.

including Hammond, produced documents, and responded to the requests for admission.

The Secretary also objected to particular interrogatories and document requests on the ground that they sought information protected by the attorney-client or work product privileges. Caton moved to compel responses to these interrogatories, as well as interrogatory answers from the balance of the individuals. He also propounded additional interrogatories, again seeking sworn responses from a number of different individuals. The Secretary objected to the motion and cross-moved for a protective order against the additional interrogatories, to which Caton objected. These motions were referred to the magistrate, who denied the motion to compel and granted the motion for a protective order.[3]

Hammond states in her interrogatory answers, as she had in her declaration in support of the motion to correct the record, that nobody instructed her to substitute another copy of document 60 for document 6 in the January 20 production, but that the substitution resulted from her error in assembling the documents. Hammond also reiterates that she obtained the printout of the e-mails constituting document 6 from either the copy of the Park Service file which had been returned from the Department's FOIA

---

[3]Caton has not objected to the rulings on these motions.

appeal office or from one of the LNHP's own files.[4]

Hammond acknowledges that, in the summer of 2004, she reviewed the documents that had been withheld from Caton at the request of the Department's FOIA appeals officer.  During this review, she may have placed the handwritten bracketing, strikethroughs, and notations of the word "release" which appear on the version of document 60 produced on January 20, although she has no present memory of doing so.  In any event, Hammond avers that nobody instructed her to make those markings, and everybody else who has provided answers to Caton's interrogatories denies making the markings.[5]  Finally, as for the provenance of document 6 itself, Charles Parrot, the author of two of the three constituent e-mails and a recipient of the

---

[4]Following the very first release of documents to Caton, Hammond's predecessor, Audrey Ambrosino, made two copies of each of the seventy-five documents which had been withheld from that release.  Ambrosino sent one set of the copies to the FOIA appeals office and retained the other set in her own file. Hammond recalls that this file was the source of the unredacted version of document 60 released on January 20 and that unredacted version of document 6 released on January 25 came from the original LNHP contract file.

[5]Hammond also states that she relied solely on the instructions contained in the copies of the documents attached to Murphy's memorandum, rather than any of her own notations, in creating the redacted version of the document released to Caton.

third, states that he did nothing with those communications after sending and receiving them.[6]

## Discussion

In support of her second motion to dismiss, the Secretary argues, again, that Caton's FOIA claim is moot because he has by now received unredacted copies of all of the documents within the scope of his FOIA request. Specifically, the Secretary notes that Caton's extensive discovery on how a second copy of document 60 came to take the place of document 6 in the January 20 release has revealed only the innocent explanation that Hammond mistook the e-mails constituting document 60 for those constituting document 6 in searching for a clean copy of document 6.

As the court noted in its previous order, an agency can secure dismissal of a plaintiff's FOIA action as moot by demonstrating the adequacy of its response to the plaintiff's FOIA request. 2005 DNH 76, 2005 WL 1009544, at *4. Generally, the agency must make this showing through a detailed and nonconclusory affidavit from one of its responsible employees, submitted in good faith. Id. (quoting Maynard, 986 F.2d at 559). "Such affidavits enjoy 'a presumption of good faith, which cannot

---

[6]Peter Aucella, who received all of the e-mails, tells the same story.

be rebutted by purely speculative claims about the existence and discoverability of other documents.'" Id. (quoting Maynard, 986 F.2d at 560) (internal quotation marks omitted).

In its prior order, the court found that Caton had overcome this presumption by casting doubt on Hammond's explanation for the substitution of document 60 for document 6 in the January 20 production, particularly because that explanation went "to the heart of how [Caton's FOIA] request was processed." Id. at *5. Hammond's subsequent declaration, however, recounts in detail how she prepared both the November 4 and January 20 releases of documents to Caton, giving a plausible explanation for how she came to confuse document numbers 6 and 60. Indeed, because each document is a printout of a series of e-mail messages among more or less the same correspondents, the documents appear nearly identical; the differences becomes apparent only when one examines the actual text. Hammond therefore credibly explains how she confused one document for the other while searching through unnumbered file copies for an unredacted version to release to Caton on January 20.

In his objection to the motion, Caton strives valiantly to call this explanation into question. He suggests that, because all of the documents originally withheld in response to his FOIA request tend to undermine in some way the LNHP's position in what

17

appears to be an ongoing dispute over work that Caton's
construction company did at the park, the LNHP would have good
reason to falsify those documents or to hide others.
Specifically, Caton characterizes document 60 as evidence that
the LNHP interfered with his performance of the work.  But
whatever the strength of this characterization, it suggests no
particular ulterior motive for keeping <u>document 6</u> from Caton.
His argument in this regard therefore amounts to the sort of
speculation insufficient to overcome the presumption of good
faith.  <u>See</u> <u>Maynard</u>, 986 F.2d at 560.

Caton also recounts the tortured path of the response to his
FOIA request in great detail, suggesting that its is marked by
"not in good faith acts" on the part of the Department.  Mem.
Obj. Second Mot. Dismiss at 8.  The court notes that it shares
Caton's frustration in this regard, to a degree.  The Supreme
Court has observed that "disclosure, not secrecy, is the dominant
objective of [FOIA]."  <u>Dep't of Interior v. Klamath Water Users</u>
<u>Protective Ass'n</u>, 532 U.S. 1, 8 (2001) (internal quotation marks
omitted).  Similarly, the First Circuit has held that "[t]he
policy underlying [FOIA] . . . 'is . . . one of broad disclosure,
and the government must supply any information requested by an
individual unless it determines that a specific exemption,
narrowly construed, applies.'"  <u>Maine v. Dep't of Interior</u>, 298

18

F.3d 60, 65 (1st Cir. 2002) (quoting <u>Church of Scientology Int'l</u>
<u>v. Dep't of Justice</u>, 30 F.3d 224, 228 (1st Cir. 1994)).

The Department does not appear to have taken these
principles to heart in processing Caton's FOIA request.  As
discussed in the court's prior order, Ambrosino initially
responded to the request by allowing Caton to review the subject
LNHP files at its office.  2005 DNH 76, 2005 WL 1009544, at *1;
<u>see also</u> Second Hammond Decl. ¶ 3.  It was at this early stage,
in preparing for Caton's visit, that the Department's careless
handling of his FOIA request began.  According to Murphy's
memorandum, when Ambrosino received the files from the
contracting officer ("CO"), she "believed the CO [had] removed
exempt information from the files and the CO believed [Ambrosino]
would remove the exempt documents."[7]  <u>Id.</u> ¶ 7(b), Ex. 8, at 4.
This misunderstanding resulted in Caton's unfettered access to
all of the documents in the files, including information
potentially exempt from disclosure.  So he must have been
surprised to learn, in response to his request that the LNHP
provide him with copies of certain records he had seen there,

---

[7]Caton, however, alleges that the CO told him that Ambrosino
had marked payroll records in the files with adhesive tape and
instructed him not to look at those documents, an order which he
obeyed.  Compl. ¶ 13.  Caton also states that he never requested
copies of any of the payroll records.

that the LNHP was refusing to produce some seventy-five documents
on the ground that they were protected by the deliberative
process privilege.

Caton appealed this determination to the Department, which
decided in the first instance that the privilege did not shield
some thirty of the documents in their entirety and another forty-
three of the documents in part.  But the Department rejected
Caton's argument that the LNHP had waived any privilege by
letting him see the documents, reasoning that "as soon as [the
LNHP] recognized its mistake in allowing Mr. Caton to review
exempt information, it took immediate steps to remedy the
situation."  Second Hammond Decl. ¶ 7(b), Ex. 8, at 4.

According to Murphy's memorandum, however, the only remedial
step the LNHP took after realizing it had disclosed such
documents was to claim the privilege in refusing to provide Caton
with copies in a letter sent six weeks after the disclosure.  Cf.
Astley v. Lawson, 1991 WL 7162, at *8 (D.D.C. Jan. 11, 1991)
(finding no waiver of privilege as to documents mistakenly
attached as exhibits to motion to dismiss FOIA action where
agency's counsel moved to seal documents as soon as mistake
recognized and plaintiff, who was incarcerated, presumably never
saw them).  By Murphy's account, the LNHP also made no effort to
remove any potentially exempt documents from its files before

20

allowing Caton to rummage through them.  Cf. Fleet Nat'l Bank v.
Tonneson & Co., 150 F.R.D. 10, 15 (D. Mass. 1993) (finding no
waiver of work product privilege as to three-volume report where
one volume inadvertently left among documents to be inspected by
opposing counsel but other two volumes removed as part of pre-
inspection screening for privileged materials).

    Most importantly, the very documents the Department later
claimed were privileged had been disclosed to Caton himself, so
the asserted waiver was not based on the agency's release of
exempt information to a third party, cf. LaRouche v. Dep't of
Justice, No. 90-2573, slip op. at 24 (D.D.C. July 5, 2001), or
the agency's release of different records covering a similar
subject, cf. Fort Hall Landowners Alliance, Inc. v. Bureau of
Indian Affairs, No. 99-00052, slip op. at 13-14 (D. Idaho Mar.
17, 2000).  The authorities the memorandum cites in support of
the Department's position that the LNHP had not waived any
privilege, then, simply do not support that conclusion.[8]  In

---

[8]Three of the cases, in fact, do not even address the issue
of an agency's waiver of FOIA exemptions.  See Pub. Citizen
Health Res. Group v. FDA, 953 F. Supp. 400, 404 (D.D.C. 1996)
(issuing temporary protective order forbidding public
dissemination of table erroneously disclosed in response to FOIA
request when similar tables withheld as confidential commercial
information, without any discussion of whether disclosure
effected waiver); Kay v. FCC, 867 F. Supp. 11, 23-24 (D.D.C.
1994) (rejecting argument that FCC's inadvertent release of
letters to possible witnesses for potential enforcement action

fact, there does not appear to be any reported case suggesting
that an agency can respond to a FOIA request by simply opening
its files to the requester, without any attempt to segregate
potentially exempt material beforehand, only to subsequently
refuse to provide the requester with copies of the documents he
has already seen, on the basis of privilege.[9]  Cf. North Dakota

---

"undermine[d] the FCC's position that all of the material still
withheld" remained protected by law enforcement privilege,
without any discussion of whether privilege waived as to letters
themselves); Nation Magazine v. Dep't of State, 805 F. Supp. 68,
72 (D.D.C. 1992) (denying motion for temporary restraining order
requiring agency's immediate processing of plaintiff's FOIA
request for files on presidential candidate despite argument that
agency had expedited requests for similar files on another
presidential candidate).  Although the court in Am. Lawyer Media,
Inc. v. SEC, 2002 U.S. Dist. LEXIS 16940 (D.D.C. Sept. 6, 2002),
refused to find waiver of a FOIA exemption based on the fact that
the agency allowed the plaintiff to inspect the document at
issue, the court, for reasons that are unclear from the opinion,
limited its inquiry to whether the plaintiff could show that the
document had entered the public domain.  Id. at *3.  But an
agency need not go as far as placing a document in the public
domain to waive potential FOIA exemptions; "[w]aiver can occur
when communications are disclosed to private individuals . . . ."
Chilivis v. SEC, 673 F.2d 1205, 1212 (11th Cir. 1982); see also
United States v. Metro. St. Louis Sewer Dist., 952 F.2d 1040,
1045 & n.2 (8th Cir. 1992); Mobil Oil Corp. v. EPA, 879 F.2d 698,
700 (9th Cir. 1989).

    [9]Indeed, outside of the FOIA context, the First Circuit has
rejected the same argument premised on nearly identical facts,
noting that it "beggars credulity."  Texaco P.R., Inc. v. Dep't
of Consumer Affairs, 60 F.3d 867, 883 (1st Cir. 1995).  There,
just like the LNHP in this case, the party responding to a
request for information told the party seeking it, "here is a
room full of papers, you can take a look at them."  Id. at 883

ex rel. Olson v. Andrus, 581 F.2d 177, 181–82 (8th Cir. 1978);

Educ./Instruccion, Inc. v. HUD, 471 F. Supp. 1074, 1081 (D. Mass.

1979).  As the Eighth Circuit noted in Andrus, when the records

in question have already been disclosed, an agency cannot

credibly claim that releasing them in response to a FOIA request

will "impede the proper functioning of the administrative process

or inhibit the free and frank exchange of opinions among

government personnel," because the agency "has already indicated

a diminished expectation of privacy concerning these documents

through its prior voluntary disclosure."  581 F.2d at 181–82;

accord In re Sealed Case, 877 F.2d 976, 980 (D.C. Cir. 1989)

("Normally the amount of care taken to ensure confidentiality

reflects the importance of that confidentiality to the holder of

the privilege.")

     In any event, shortly after Caton filed suit challenging the

determination that the LNHP had not waived any privilege, the

Department proposed to settle the case by releasing all of the

---

n.9.  After the party seeking discovery asked for copies of
certain documents it had seen during this exercise, however, the
responding party, just like the LNHP, refused to provide them on
the basis of privilege.  Id.  The district court ruled that the
responding party had waived any such privilege, and the circuit
agreed.  Id. at 883.

subject documents in their entirety except for document 60.[10]
When Caton refused that offer, the Department agreed to turn over
unredacted copies of all of the documents.  Caton argues that the
Department's initial refusal to release an unredacted copy of
document 60 evinces "a furtive design to keep disclosed
information from [him]."  Mem. Obj. Second Mot. Dismiss at 12-13.
The court disagrees with Caton's suggestion that the Department's
offer to settle embodies the kind of bad faith tending to show
that the response to his FOIA request remains incomplete.  See
Military Audit Project v. Casey, 656 F.2d 724, 754 (D.C. Cir.
1981).  Nevertheless, the court notes again that it shares Caton
frustration that the Department's response to his FOIA request
stands at odds with the purposes of FOIA.

Congress amended FOIA in 1974 in an attempt to remedy "a
general dissatisfaction with the administrative response to the
policy of open government embodied in the Act," including
"substantial foot-dragging on the part of administrative
officials who . . . forced citizens requesting information under

---

[10]Before communicating this offer to Caton, Plourde
"examined the document under the criteria set out in FOIA
exemption 5 and determined that there appeared to be reasonable
grounds to assert the exemption as to some of the information in
the document."  Second Plourde Decl. ¶ 9.  Plourde does not say,
however, whether he also determined that the Department had
"reasonable grounds" to assert that the claimed privilege had not
been waived.

. . . FOIA to resort to expensive litigation for vindication of
their statutory rights."[11]  Nationwide Bldg. Maintenance, Inc. v.
Sampson, 559 F.2d 704, 710 (D.C. Cir. 1977) (footnote omitted);
see also Crooker v. Dep't of Justice, 632 F.2d 916, 920 (1st Cir.
1980).  In light of this history, an agency's release of
documents it had previously withheld as soon as litigation
commences tends to undermine the legitimacy of the decision to
withhold the documents in the first place.

The court recognizes that this course is preferable to an
agency's defending a questionable refusal to release the records
until a court rules against it.  See Military Audit Project, 656
F.2d at 754.  More generally, the court also recognizes that the
simple act of bringing a lawsuit often provides the necessary
impetus for a recalcitrant party to fulfill its legal
obligations.  For the purposes underlying FOIA to be given full
effect, however, an agency must thoroughly examine and re-examine
its invocation of any FOIA exemptions before forcing the
requester to resort to the judicial process.  Ignoring this
responsibility, as Congress noted, leaves the impression that the
agency is hoping the requester will simply give up on his or her

---

[11]The amendment, inter alia, provided for the award of
attorneys' fees and costs to successful FOIA plaintiffs and
imposed time limits on agency responses to FOIA requests.  Pub.
L. No. 93-502, 88 Stat. 1561 (1974).

rights under the statute rather than starting what could become a protracted and expensive court battle with the federal government.

This case leaves just such an impression. Again, while the Department's willingness to produce all of the information once Caton had filed suit does not itself indicate bad faith, that sudden reversal of course, coupled with the Department's dubious conclusion that the LNHP had not waived any exemption to disclosure, suggests that the Department did not take its FOIA obligations seriously. Indeed, that much is apparent from nearly every step in the Department's handling of Caton's FOIA request, both before and after he filed suit.

In addition to its admitted failure to segregate exempt documents from the files it made available to Caton for inspection, the LNHP bungled its response to the request at almost every turn. Hammond did not retain a clean copy of the numbered set of documents attached to Murphy's memorandum, despite the significant possibility that she might have to produce one or more of them in unredacted form if Caton were dissatisfied with the redacted versions. Her carelessness in this regard led directly to her further error in substituting a second copy of document 60 for document 6 in the January 20 production. Hammond then appears to have completely disregarded

Plourde's request that she "figure out what had happened" to give rise to that mistake after Caton brought it to his attention. Hammond simply forwarded a copy of document 6 to Caton together with an explanation that made no sense whatsoever in light of either her method of assembling the unredacted documents for the January 20 production or the face of document 6 itself.

Worse yet, at a point ten days removed from what Hammond describes as the "considerable stress" of making a complete response to Caton's FOIA request, she signed a declaration to be submitted to this court giving the same explanation, despite the fact that she had yet to consider whether it was true.  Plourde, for his part, managed to draft the declaration to include that explanation without noticing that it could not have been correct. This point should have been apparent to Plourde from the copy of document 60 from the January 20 production, which Caton had forwarded to him by then.  Plourde's declaration in support of the motion to correct the record, however, gives no indication that he did anything to assure himself of the accuracy of Hammond's assertion before submitting her declaration to the court as the evidentiary basis of the motion to dismiss, despite his prior acknowledgment of the irregularity in the January 20 production as "curious."  In fact, both Plourde and Hammond appear to have waited until Caton pointed out the apparent

falsity before checking the accuracy of her "quick assumption" as
to how the error in production had occurred.

Plourde subsequently met with Hammond for this purpose and
learned that the statement in her declaration explaining this
error was indeed false.  Under the New Hampshire Rules of
Professional Conduct, which govern practice in this court, L.R.
83.5, DR-1, "[a] lawyer shall not knowingly . . . offer evidence
that the lawyer knows to be false.  If a lawyer has offered
material evidence and comes to know of its falsity, the lawyer
shall take reasonable remedial measures."  N.H. R. Prof. Conduct
3.3(a)(3).  Although Plourde did not know Hammond's statement was
false when he submitted her declaration to the court, he came to
know of its falsity on March 2, 2005.  At that point, he had
already filed the Department's reply to Caton's objection to the
motion to dismiss, but had yet to respond to his motion to
strike, which also argued that Hammond's explanation of the
irregularity in the January 20 production was wrong.  Plourde,
however, did not disclose his knowledge of this fact to the court
by way of the Department's objection to the motion to strike.
Instead, he characterized Caton's "allegations regarding the
apparent mis-numbering and substitution of Document #60" as
"immaterial in light of his admitted receipt of complete,
unredacted copies of both Documents 6 and 60."

Plourde does not suggest that this statement, contained in a footnote to the objection, constitutes the "reasonable remedial measures" which Rule 3.3 requires of a lawyer who comes to know that he or she has offered material evidence which he later discovers to be false.  Plourde states instead that he simply did not consider Hammond's explanation to be material to whether the Department had fully responded to Caton's FOIA request.

In the court's view, Plourde was mistaken in concluding that a false statement as to how Caton's FOIA request was processed, contained in a declaration submitted to show the adequacy of the Department's response to that request, would have no bearing on whether the Department had successfully demonstrated that fact so as to merit dismissal of the case as moot.  Both Caton's brief objecting to the motion to dismiss and his brief in support of his motion to strike argued that he could obtain discovery, despite the Department's claim that it had fully responded to his FOIA request, because he had made "'a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations.'"  Mem. Opp'n Mot. Dismiss ¶ 57 (quoting <u>Carney</u>, 19 F.3d at 812).  Caton based this argument on, <u>inter alia</u>, the apparent falsity in Hammond's declaration.  <u>Id.</u> ¶¶ 50-55, 68. Caton's brief therefore demonstrated the materiality of the false statement to the adequacy of the FOIA response.

Even if Plourde had somehow missed this point, however, he should have realized as a matter of common sense that a declaration falsely attesting as to how an agency processed a FOIA response simply cannot serve to demonstrate its adequacy as is required to secure dismissal of a FOIA case as moot. Plourde had an obligation to notify the court and Caton promptly when he became aware of Hammond's false statement and to file a corrected version of that statement promptly. At the same time he could have pursued his contention that the falsity of the statement was immaterial to the first motion to dismiss by seeking leave to file a memorandum making that argument.[12] The cumulative effect of the Department's intransigence, the LNHP's carelessness, and Plourde's mistaken conclusion was to further delay the final resolution of Caton's FOIA request. This delay has in turn unnecessarily consumed Caton's resources, as well as those of the Department, the United States Attorney's Office, and the court.

---

[12]As it is, Plourde has yet to call the court's attention to any authority for the proposition that an agency can show the adequacy of its response to a FOIA request through a declaration containing a false statement as to how the request was processed. Plourde's suggestion that Caton's own submissions established the adequacy of the Department's response, rendering any deficiencies in Hammond's declaration irrelevant, ignores the basis of Caton's objection to the first motion to dismiss. Although Caton did not contest that he received an unredacted version of a document numbered 6, he vigorously disputed--and still does--that this document was in fact an accurate copy of the record in question.

30

Nevertheless, the court concludes that the Department's mistakes in handling Caton's FOIA request do not suffice to overcome the presumption of good faith which accompanies the Second Hammond Declaration.  As previously noted, Hammond has by now convincingly explained those mistakes, and her explanations leave no room for any real possibility that further documents exist which are responsive to Caton's request.  See Maynard, 986 F.2d at 559-565.  In the FOIA context, "what is expected of a law-abiding agency is that it admit and correct error when error is revealed."  Meeropol v. Meese, 790 F.2d 942, 953 (D.C. Cir. 1986).  Now that the Department has done that, albeit belatedly, Caton's FOIA case has become moot.

In his objection to the second motion to dismiss, Caton notes that he seeks "reasonable attorneys' fees and all . . . litigation costs" associated with this lawsuit.[13]  Mem. Obj. Second Mot. Dismiss at 21.  Because Caton has prosecuted this action in a pro se capacity, he cannot recover attorneys' fees under controlling First Circuit law.  See Aronson v. HUD, 866

---

[13]Caton also seeks "agency records concerning the 5 construction contracts."  Mem. Obj. Second Mot. Dismiss at 21. To the extent Caton wants the agency to provide copies of those files in their entirety, rather than just the particular documents from the files he designated for copying in December, 2003, that relief is barred, as the court ruled in denying Caton's motion to amend.  2005 DNH 76, 2005 WL 1009544, at *3.

F.2d 1, 4 (1st Cir. 1989); Crooker, 632 F.2d at 920-22.  If Caton
wishes to pursue his request for costs, he shall do so by way of
a bill for costs served and filed in accordance with the time
limitations and other provisions of Local Rule 54.1.  Caton's
memorandum in support of any such bill, see L.R. 54.1(b), shall
address the issue of whether he has "substantially prevailed" in
this action within the meaning of 5 U.S.C. § 552(a)(4)(E) as well
as the "equitable factors" set forth in Crooker.  See Maynard,
986 F.2d at 568.  The Secretary shall be entitled to file any
objections to the bill in accordance with L.R. 54.1(c).


                              Conclusion

     For the foregoing reasons, the Secretary's second motion to
dismiss the case as moot (document no. 36) is GRANTED.  The clerk
shall enter judgment accordingly and close the case.

     It is most unfortunate that the resources of the plaintiff,
the Department of the Interior, the United States Attorney's
Office, and this court were expended in litigation that did not
have to occur.  In the interest of avoiding such waste of
resources in the future in matters involving FOIA and the
Department of the Interior, the court is directing counsel for
the defendant to forward copies of this order to Secretary of the
Interior Gale Norton, the Department's Division of General Law,

                                 32

and the Chief of the Civil Division of the United States
Attorney's Office for the District of New Hampshire.   Secretary
Norton would be well advised to undertake a comprehensive review
of all aspects of how the Department responds to FOIA requests.
What happened in this case is not good government and should not
be repeated.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

November 21, 2005

cc:  Harold W. Caton, pro se
     T. David Plourde, Esquire

33